BRENDA R. SHECKLES, Petitioner v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Sheckles v. Commissioner
Docket No. 616-80.
United States Tax Court
T.C. Memo 1984-289; 1984 Tax Ct. Memo LEXIS 380; 48 T.C.M. (CCH) 222; T.C.M. (RIA) 84289; June 4, 1984. Dale C. Allen, for the petitioner. Shuford A. Tucker, Jr., for the respondent. HAMBLEN
MEMORANDUM FINDINGS OF FACT AND OPINION HAMBLEN, Judge: Respondent determined the following deficiencies in and additions to Federal income taxes of petitioner and *381 her former husband, Ell C. Sheckles: [1]
Addition under
Year
Deficiency
Sec. 6653(b) [2]
1970
$1,927.54
$963.77
1971
5,617.66
2,808.83
1972
9,559.47
4,779.74
1973
10,147.46
5,073.73
1974
199.12
The parties have agreed that the deficiency amounts are correct as determined by respondent. The issues remaining for decision are: (1) Whether petitioner is entitled to relief from liability for all years in issue under the innocent spouse provisions of section 6013(e); and (2) whether petitioner is subject to the 50 percent addition to tax for fraud under section 6653(b). Some of the facts have been stipulated and are *382 found accordingly. The stipulation of facts and attached exhibits are incorporated herein by this reference. Petitioner resided in Knowville, Tennessee, when she filed her petition in this case. During the taxable years 1970 through 1974, she was married to Ell C. Sheckles ("Sheckles"), from whom she was divorced on October 2, 1975. For each of the years in issue, petitioner and Sheckles filed a joing Federal income tax return with the Internal Revenue Service Center at Memphis, Tennessee. During the years in issue, Sheckles was a sign painter who worked as a subcontractor for Creative Displays, Inc. ("Creative Displays") and other firms in the area of Knoxville, Tennessee. Sheckles received a weekly check from a subcontractor labor account of Creative Displays. In addition, he received various amounts for work not contracted through that firm. However, as the following figures indicate, petitioner and Sheckles did not report all amounts so received on their Federal income tax returns: Amount Paid by
Amount Paid by
Amount Reported
Year
Creative Displays
All Sources
on Return
1970
$11,678.23
$19,708.67
$11,588.00
1971
34,526.81
37,053.81
13,910.09
1972
41,678.31
47,090.31
15,745,40
1973
42,862.25
49,082.25
15,858.00
1974
50,298.41
55,863.41
52,548.00
*383 Petitioner maintained personal financial records for herself and Sheckles. She was also responsible for recordkeeping for her husband's business. Petitioner had access to bank accounts, made deposits, paid personal and business expenses by writing checks, reconciled bank statements, and prepared all tax returns for the years in issue. Petitioner also prepard invoices which were presented to Creative Displays for payment. On more than one occasion, invoices prepard by petitioner were observed by Jim Foust ("Foust"), an employee of Sheckles who accompanied him on several jobs. However, petitioner claims to have participated only minimally in the preparation of invoices. She estimates that she prepared no more than 15 to 20 invoices during her entire marriage to Sheckles. Petitioner was exposed to basic accounting concepts at Rural High School, from which she was graduated in 1962 and at which she took a bookkeeping course. From 1963 through 1967, petitioner was employed as a secretary in the accounting department of The Knoxville News Sentinal, a newspaper. She also worked in the cashier's cage at the Sentinal and was familiar with accounting concepts, including "accounts *384 payable." From 1967 through 1972, petitioner worked as a secretary for the Tennessee Valley Authority. After the birth of her daughter in 1972, petitioner did not work outside her home. While examining the corporate income tax returns of Creative Displays in 1975, respondent's agent noticed that frequent payments were made to Sheckles for subcontractor labor. Respondent requested Sheckles furnish copies of his personal tax returns and other records for 1972 and 1973. Petitioner cooperated with respondent and presented records, including cancelled checks, bank statements, check stubs from Creative Displays, savings account records, paid bills, receipts, and adding machine tapes. After examining these items, respondent's agent referred the case against petitioner and Sheckles to the Criminal Investigation Division of the Internal Revenue Service. Thereafter, a criminal indictment was returned against petitioner and Sheckles, charging them with willful evasion of income taxes for 1970 through 1973 and with willfully and knowingly making and subscribing false returns for those taxable years. Sheckles was sentenced to one year and one day in prison after pleading guilty to two *385 counts of the indictment on May 5, 1977. The indictment against petitioner was dismissed on June 28, 1977. Sheckles claims to have furnished all financial records, including check stubs from Creative Displays, to petitioner in normal course. Petitioner denies having had total access to financial information regarding Sheckles' business until 1975. Petitioner claims that Sheckles furnished accurate income information to her only when respondent's agent made inquiries in connection with the examination of the corporate tax returns of Creative Displays. Prior to that time, petitioner was aware of Sheckles' income only insofar as he chose to make her aware. Sheckles regularly cashed the checks he received from Creative Displays and then provided cash to petitioner to pay personal and business expenses. Sheckles did not relinquish the checks themselves to petitioner. Petitioner professes ignorance of any income received by Sheckles beyond that which he reported to her and provided in the form of cash. After meeting with respondent's agent in 1975, petitioner contacted Creative Displays to ascertain the total amount paid by them to Sheckles during taxable year 1974.However, she *386 took no steps to obtain similar figures for earlier years. Throughout her marriage to Sheckles, petitioner lived modestly. The family home, purchased in 1972, cost $10,250.00. It was located next door to an automobile junkyard and was burglarized at least once during the years in issue. Only $250.00 was required as a downpayment on the house, and monthly mortgage payments were $93.00. Sheckles did not spend money lavishly on petitioner or their daughter.In fact, petitioner used her own bank account, consisting of money acquired before her marriage and from her own retirement benefits, to finance a remodeling of the bathroom in the family home. Petitioner believed such renovation was necessary for the health and safety of her young daughter. Sheckles' own lifestyle was somewhat more extravagant. During the years in issue, he owned 150 pairs of boots, including approximately 75 pairs of cowboy boots. He also purchased a Corvette automobile, a truck, and several motorcycles. The Corvette was initially financed by a withdrawal of $5,304.00 from the joint personal bank account of petitioner and Sheckles. However, Sheckles redeposited most of this amount appriximately one month *387 after withdrawing it, explaining to petitioner that he had borrowed the necessary funds from Creative Displays. Sheckles claimed that Creative Displays had agreed to give him the needed money in advance and then deduct it from future checks. Sheckles spent money not only on himself, but also on Judith Hudson ("Judith"). Judith married Sheckles after his divorce from petitioner, but the liason between Judith and Sheckles was ongoing prior to his divorce from petitioner. In fact, Judith and Sheckles had a child together born approximately one month after Sheckles' divorce from petitioner. In addition to money routinely spent by Sheckles in maintaining his relationship with Judith, he purchased several gifts for her, including a watch and a necklace. Sheckles maintained a cash hoard and accumulated between $30,000.00 and $50,000.00 prior to 1975. Sheckles claims to have kept this money in the only stove in the family home, but petitioner denies having ever seen it there. On August 22, 1974, petitioner and Sheckles obtained a safe deposit box at a bank. Although the box was opened jointly, only Sheckles physically entered it on that occasion. Petitioner thought that the purpose *388 of obtaining the box was to protect birth certificates, insurance policies, and other important papers. She was unaware of any cash hoard until February 24, 1975, at which time she entered the box with Sheckles. Petitioner questioned Sheckles upon seeing the cash hoard, but he refused to provide any information to her. Petitioner and Sheckles were married in 1968, separated during July of 1975, and were divorced on October 2, 1975. Under the terms of the divorce decree, petitioner received a certificate of deposit in the amount of $10,000.00, the family home, household furnishings, and a 1968 Chevrolet Impala automobile.The funds in the certificate had come from the couple's joint savings account. The account balance had been $12,018.30 at the end of 1969 and had increased by only $796.15 as of the time funds were transferred to the certificate of deposit. Petitioner had accumulated $10,000.00 from her earnings as a secretary prior to her marriage. Similarly, the household furnishings consisted largely of items purchased by petitioner from her own earnings, and the Impala had been purchased by petitioner before her marriage and used by her throughout her marriage. In his *389 notice of deficiency, respondent determined additional taxes due to unreported income.He further determined additions to tax for fraud, and he asserts that petitioner is liable for such additions. Petitioner does not contest the determined deficiencies, but claims relief from liability as an innocent spouse. Furthermore, she denies having knowingly participated in the fraudulent underreporting of income from which the deficiencies arose. Where a joint return is filed pursuant to section 6013(e), section 6013(d)(3) provides a special rule which states: [I]f a joint return is made, the tax shall be computed on the aggregate income and the liability with respect to the tax shall be joint and several. The rule extends not only to the tax itself, but also to any additions to tax. See sec. 6662(a)(2). In certain cases, however, the so-called "innocent spouse" provision permits a spouse to be relieved of liability. Section 6013(e)(1) provides: (1) In General. Under regulations prescribed by the Secretary or his delegate, if-- (A) a joint return has been made under this section for a taxable year and on such return there was omitted from gross income an amount properly *390 includable therein which is attributable to one spouse and which is in excess of 25 percent of the amount of gross income stated in the return, (b) the other spouse establishes that in signing the return he or she did not know of, and had no reason to know of, such omission, and (C) taking into account whether or not the other spouse significantly benefited directly or indirectly from the items omitted from gross income and taking into account all other facts and circumstances, it is inequitable to hold the other spouse liable for the deficiency in tax for such taxable year attributable to such ommission, then the other spouse shall be relieved of liability for tax (including interest, penalties, and other amounts) for such taxable year to the extent that such liability is attributable to such omission from gross income. The requirements are concurrent, not alternative; therefore, a failure to meet any of the requirements precludes the application of section 6013(e). Each requirement is examined below with reference to the facts of the instant case. Section 6013(e)(1)(A): It is uncontested that joint returns were filed for all years in issue, and that properly includable *391 income items were omitted therefrom. Furthermore, all income items were properly attributable to Sheckles as his business generated all gross receipts, both reported and unreported. The only remaining question under section 6013(e)(1)(A), therefore, is whether the omitted amounts exceeded 25 percent of the stated amounts of income for each tazable year. The answer to that question is provided in the calculations below: Actual
Stated
25 Percent of
Omitted
Year
Amount
Amount
Stated Amount
Amount
1970
$19,708.67
$11,588.00
$ 2,897.00
$ 8,120.67
1971
37,053.81
13,910.09
3,477.52
23,143.72
1972
47,090.31
15,745.40
3,936.35
31,344.91
1973
49,082.25
15,858.00
3,964.50
33,224.25
1974
55,863.41
52,548.00
13,137.00
3,315.41
In order to exceed 25 percent, the amount in the last column ("Omitted Amount") must be greater than the amount in the column which precedes it ("25 Percent of Stated Amount"). This is clearly the case for the years 1970 through 1973. For 1974, however, the omitted amount is less than 25 percent of the stated amount. Thus, petitioner is not entitled to relief under section 6013(e) for tax year 1974. *392 Section 6013(e)(1)(B): Petitioner is not entitled to innocent spouse relief if she knew, or had reason to know, of the omissions. In the instant case, there is conflicting evidence as to petitioner's actual knowledge. Respondent asserts that petitioner was totally in control of the family finances, including her husband's business accounts. Petitioner, on the other hand, presents herself as a passive processor of information provided to her by Sheckles. The truth lies somewhere between these two extreme positions. Upon examination of the record, we conclude that petitioner was not a mere bystander to her own financial affairs or to those of Sheckles' business. Rather, she was an active participant: She prepared at least some invoices; she made bank account deposits; she balanced the checkbook and reconciled bank statements; she wrote checks in payment of household bills and business expenses; she maintained books and records; she prepared tax returns; and she had access to at least some of the cash generated by Sheckles' business. At the same time, Sheckles' concealment of income from petitioner prevented her from being fully informed as to the amounts generated by his business. *393 This misinformation led to her faulty maintenance of records and reporting for tax purposes. We conclude that petitioner did not have actual knowledge of omissions of gross income. This lack of knowledge, however, is not sufficient to meet the test of section 6013(e)(1)(B). The more pertinent question is whether petitioner had reason to know of the omissions. We find that petitioner had several reasons to know and was in a position to detect omissions. The standard to be applied in determining whether a taxpayer had reason to know of omissions is whether a reasonable person under the circumstances of the taxpayer at the time of signing the return could be expected to know of the omission. ; . Petitioner's circumstances upon signing the returns were that she had access to and control of family financial records. Furthermore, she had at least some familiarity with standard bookkeeping and financial practices, having studied bookkeeping in high school and having worked outside the home in related capacities. Under these circumstances, we *394 conclude that a reasonable person would have been aware of disparities between reported and actual income. Petitioner's access to financial records of Sheckles' business provided her with unmistakable evidence of his fraudulent reporting practices. Participation in a spouse's business affairs or bookkeeping has been held to negate a claim of lack of reason to know. See, e.g., , affd. ; . In the instant case, even accepting that petitioner did not prepare all invoices for Sheckles' business, we know from her own admission and from the independent testimony of Foust that petitioner prepared at least some invoices. Therefore, she was in a position to notice that adequate records of "accounts payable" (a concept with which she was familiar) were not kept. Furthermore, petitioner knew of Sheckles' practice of cashing checks he received and then providing her with cash. Since petitioner had access to bank accounts, made deposits, and regularly paid both personal and business expenses by check, it would not require strenuous *395 intellectual exercise to deduce that the cash which Sheckles gave to her was not his entire income. If Sheckles were giving his entire income to petitioner, there would be no reason to convert his paycheck into cash, only to be deposited and reconverted into checks. The only reason for the additional banking step was to conceal gross receipts. Sheckles' explanation of the financing of his Corvette should also have raised doubts in petitioner's mind. As the primary controller of family finances, it is dubious that petitioner would not further inquire as to the terms of the loan from Creative Displays. Evidence of personal indebtedness would be a routine document to retain with household records, and any interest paid on such loan would generate a common tax deduction. Additionally, since petitioner wrote no checks for principal or interest payments, she must have believed the proferred explanation that Creative Displays would hold back sums from Sheckles' checks to meet loan payment obligations. Thus, petitioner should have known that Sheckles' actual earnings exceeded the amount of cash which he gave to her, at least to the extent of loan repayments. Sheckles' relatively *396 extravagant lifestyle should also have alerted petitioner to his concealment of income. Unusual or lavish expenditures are a significant factor in determining whether a spouse had reason to know of omissions. See, e.g., ; In the instant case, we recognize that Sheckles' expenditures on behalf of Judith were not likely to have come to petitioner's attention. Nonetheless, Sheckles' purchases of various motor vehicles and excessive footwear provided clear signs of available cash. The extent of the omissions themselves render it unlikely that a prudent taxpayer would not have been aware of them. Omitted income equalled approximately 41 percent of actual income for 1970; 62 percent for 1971; 67 percent for 1972; and 68 percent for 1973. Deliberate concealment by a spouse is a factor which often supports the application of section 6013(e). See, e.g., . However, in the instant case, the fact of concealment is mitigated by the opportunities for discovery which were presented to petitioner. It is possible that a devious *397 husband could hide some excess income from his spouse; it is less likely that Sheckles could conceal between 41 and 68 percent of his actual earnings over a period of four years from a wife who was deeply involved in his business bookkeeping and tax reporting. We conclude that petitioner was unreasonable and imprudent in failing to know of underreported income for the taxable years 1970 through 1973. We find that petitioner had reason to know of the omissions under the circumstances of this case. Section 6013(e)(1)(C): This section requires a showing that it would be inequitable to hold a spouse liable. A finding of inequity requires consideration of all relevant facts and circumstances, including whether or not the claiming spouse significantly benefitted, directly or indirectly, from the omitted items. Because qualification under section 6013(e)(1) requires adherence to the requirements of all three of its subsections, discussion of the application of section 6013(e)(1)(C) is moot in the instant case. See . Our above analysis of section 6013(e)(1)(A) prevents the availability of section 6013(e)(1) *398 to taxable year 1974; our discussion of section 6013(e)(1)(B) precludes entitlement for taxable years 1970 through 1973. [3]
Section 6653(b) provides for an addition to tax equal to 50 percent of the amount of underpayment" * * * [i]f any part of any underpayment * * * of tax required to be shown on a return is due to fraud." Joint filers are jointly and severally liable for payment *399 of tax, including additions thereto. See sec. 6013(d)(3), discussed supra. However, section 6653(b) [4] modifies this general rule with respect to the addition for fraud in certain cases. It provides: In the case of a joint return under section 6013, this subsection shall not apply with respect to the tax of a spouse unless some part of the underpayment is due to the fraud of such spouse. Thus, in the instant case, it is not sufficient that respondent prove that underpayment resulted from fraud. Respondent must further prove that fraud of petitioner resulted in any part of the underpayment for each taxable year for which the addition is imposed. Fraudulent underpayment by Sheckles will not suffice to support the imposition of an addition for fraud against petitioner. *400 Respondent bears the burden of proving fraud by clear and convincing evidence. Sec. 7454(a); Rule 142(b). The fact of fraud is to be determined from the entire record. ; . Fraud must be affirmatively established, , but fraudulent intent may be proved by implications of circumstantial evidence. ; ; . A taxpayer's entire course of conduct may establish the requisite fraudulent intent. ; . A pattern of substantial underreporting of income is an example of circumstantial evidence that demonstrates fraudulent intent. , affg. a Memorandum Opinion of this Court. In the instant case, we are convinced that the substantial underreporting *401 of income over a period of several years was the result of a cohesive and fraudulent scheme to avoid the payment of income tax. We are less certain, however, that petitioner was an active participant in such scheme, rather than merely an uninformed and unwitting accomplice. Our decision above in regard to the innocent spouse issue concludes that petitioner was in a position to know, and should have known, of omissions of income. The standard for fraud is more stringent, however, and requires an affirmative showing that petitioner had the requisite fraudulent intent. In other words, while petitioner's failure to disprove that she had reason to know is sufficient to deny her the protection of section 6013(e), liability under section 6653(b) requires that respondent prove that petitioner did know of the fraudulent omissions. Were such knowledge proved, fraudulent intent could be inferred from the fact of that knowledge over a period of several years. We do not so find, however. Rather, we conclude that respondent has failed to meet his burden of proving fraudulent intent on the part of petitioner. As discussed above, it is true that petitioner actively participated *402 in both personal and business finances. It is also true that petitioner prepared the tax returns containing fraudulent omissions of income. Through these actions, she facilitated the perpetration of tax fraud through systematic underreporting of income. However, these facts of participation are insufficient to support a finding of personal fraud, absent a showing of fraudulent intent on the part of petitioner. The fraudulent intent of Sheckles plus the actions of petitioner do not necessarily add up to proof of fraudulent intent of petitioner. Rather than result from fraud, her actions might have stemmed from any of a number of plausible sources: From carelessness, from marital deference to her husband, or (as is more likely the case and as petitioner has herself suggested) from a deliberate attempt by Sheckles to withhold information from petitioner in order to prevent her detection of his fraudulent scheme. Such behavior by Sheckles is entirely consistent with his own admitted fraud and with the need of a husband who spends money on a girlfriend to shield cash from his wife. We find petitioner to be a forthright and credible witness. We accept her testimony *403 that she assumed income amounts provided to her by Sheckles to be accurate; that she had no actual knowledge of any cash hoard until her entry into the safe deposit box in February 1975; and that she had no knowledge of unreported income items prior to early 1975. We reject respondent's argument that petitioner's meticulous and accurate expense records suggest that only deliberate fraud could explain the absence of similarly impeccable income records. Instead, we accept petitioner's explanation that concealment of income by Sheckles led to her imperfect reporting of income. We see no incongruity in the fact that Sheckles provided petitioner with complete expense information (since larger deductions would decrease the amount of tax due) while providing only incomplete income information (since larger income would increase the amount of tax due). Finally, we are not convinced by respondent's theoretical scenerios of petitioner's bookkeeping practices, premised upon her complete access to all financial information. Petitioner's explanation of a financial reporting system under which she depended totally on Sheckles for information is at least equally plausible under the *404 circumstances of this case.The burden of proof being on respondent to affirmatively establish fraud, we conclude that this burden has not been carried. Petitioner's omission of income items from her financial records resulted from Sheckles' deliberate concealment of income from her; petitioner's omission of said income items from the tax returns was a consequence of their omission from the personal records. As petitioner had no control over the omissions at the bookkeeping level and had no actual knowledge thereof, she lacked the volitional element requisite to the formation of fraudulent intent. Thus, no part of any underpayment of tax for any years in issue resulted from fraud of petitioner, and we find that she is not liable for the addition to tax under section 6653(b). To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. The case of Ell C. Sheckles v. Commissioner, Docket No. 1323-80, concerned identical deficiencies in and additions to taxes. That case was conceded by petitioner therein prior to trial in the instant case. Both cases arise from the joint and several liability of petitioner and Ell C. Sheckles. ↩
2. Unless otherwise indicated, all section reference are to the Internal Revenue Code of 1954, as amended and in effect during the taxable years in issue. All rule references are to the Tax Court Rules of Practice and Procedure.↩
3. It is worth noting, however, that sec. 6013(e)(1)(C) would not itself have prevented petitioner from claiming relief under the statute. We do not find that petitioner benefitted in any way from Sheckles' omitted income. Petitioner received no benefit from the concealed cash during her marriage because Sheckles withheld the money from her, as well as from respondent. Upon divorce, the property assigned to petitioner under the decree was not attributable to any unreported income. Rather, petitioner entered into marriage possessing approximately $10,000 in cash, her car, and assorted personal and household possessions; she left marriage with the same property, supplemented only by the family home, an asset in which there was little equity beyond that which petitioner had herself contributed.↩
4. We note that this special rule for joint returns is now found in sec. 6653(b)(4). Legislation effective Sept. 3, 1982, subdivided the existing language of sec. 6653(b) and made certain changes, here inapplicable, thereto. See Pub. L. 97-248, sec. 325(a), 96 Stat. 324. However, even before the codification of sec. 6653(b) (4), the identical language was included within sec. 6653(b), as quoted.↩